**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 05-467-JBC**

**JAMES FOSTER and**
**MICHAEL MULLANNIX,**                                                    **PLAINTIFFS,**

**V.**                          **MEMORANDUM OPINION AND ORDER**

**THE CITY OF GEORGETOWN, KENTUCKY, ET AL.,**               **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on the parties' motions for summary judgment
(DE 19, 21, 23).  The court, having reviewed the record and being otherwise
advised, will deny the plaintiffs' motions for summary judgment and grant the
defendants' motion for summary judgment in part and deny it in part.

**I.     BACKGROUND**

The plaintiffs, James Foster and Michael Mullannix, were arrested in
Georgetown on October 15, 2004, and charged under Kentucky law with a felony
count of retaliating against a witness and a misdemeanor count of assault in the
fourth degree.  The alleged victim of these crimes was Richard Roberts, a witness
in a well-publicized murder case (referred to as the "Snellen murder") then pending
in state court.  After their arrest, the plaintiffs were held in the Scott County
Detention Center until they were able to post bond three days later.

Two years before the events leading to the plaintiffs' arrest, Roberts had
contacted the Georgetown police and provided important information about the

ongoing Snellen murder investigation, information he learned from his cellmate while he was incarcerated in the Scott County Detention Center.  Roberts's assistance to the Georgetown police in this murder investigation was published by a local paper, and as a result of this publicity, Roberts repeatedly informed the Georgetown police that he had endured harassment ranging from frequent taunting to occasional assaults.  The Georgetown police deemed this alleged harassment significant enough to provide Roberts and his girlfriend with some financial assistance to help them move to a new residence; however, prior to the incident at the center of this suit, no charges were ever filed against any of Roberts's alleged tormentors.  *See* DE 28 at 5, 8.  Despite Roberts's significant assistance to the Georgetown police in the Snellen murder investigation, the plaintiffs claim he also possesses a lengthy criminal record that includes a conviction for falsely reporting an unrelated assault to the Georgetown police.[1]  An awareness of Roberts's past assistance to the Georgetown police is necessary to understand both parties' accounts of the events involved in this suit, and an awareness of his alleged past

---

[1] According to the plaintiffs, by the age of 24, Roberts had "amassed *42* criminal convictions," most "of which involve[d] alcohol abuse, assault, disorderly conduct, and resisting arrest."  *See, e.g.*, DE 19-1 at 6.  To support their claim that Roberts's record includes a conviction for falsely reporting an assault to the Georgetown police, the plaintiffs have submitted a copy of a 2002 arrest warrant for Roberts's arrest on a charge of "unlawfully report[ing] an incident in the Georgetown Police Department which did not occur[,]" namely, "accusing another of committing the offense of assault in the fourth degree."  (DE 19-3 at 1.)  In deposition testimony, Detective Tom Bell, a defendant in this suit, acknowledged that Roberts was not exactly "squeaky-clean" and that his record included "a conviction for falsely reporting an incident."  (DE 28 at 6.)

2

criminal record – in particular, his alleged past false report of an unrelated assault –
is necessary to understand the plaintiffs' present arguments.

The events leading up to the plaintiffs' arrest began with a fight outside the
Lowe's store in Georgetown on October 14, 2004.  On this date, the plaintiffs and
the defendants agree that Roberts was shopping inside the Lowe's store in
Georgetown at the same time as the plaintiffs.  The plaintiffs and the defendants
also agree that alcohol could be smelled on Roberts's person, but the defendants
have testified in depositions that Roberts was not intoxicated.  *See, e.g.*, DE 28 at
7, DE 27 at 4 (both stating that Roberts smelled of alcohol but was not under the
influence of alcohol at the police station after the incident at Lowe's).  Finally, the
plaintiffs and the defendants agree that Mullannix and Roberts knew each other and
had fought each other in the past.

Beyond these agreed facts, the plaintiffs and Roberts have provided widely
divergent accounts of the events leading up to their fight in the Lowe's parking lot.
Roberts provided a written statement to the Georgetown police after the incident,
in which he claimed that the plaintiffs began taunting him inside Lowe's and
ultimately attacked him in the parking lot in order to retaliate against him for his
prior, well-publicized assistance to the Georgetown police.[2]  In contrast, the

---

[2]  More specifically, according to the written statement Roberts provided to
the Georgetown police, Mullannix approached Roberts inside Lowe's, told Roberts
that he was a friend of a suspect in the Snellen murder, called Roberts a "snitch,"
and finally told Roberts that "he was going to kick my [Roberts's] ass as soon as I
walked outside."  (DE 23-3 at 1.)  According to Roberts, he responded that they
might as well "get it over with" and the two then went out to the parking lot.  *Id.*

3

plaintiffs have testified in depositions that Roberts was the aggressor, and they further claim that video recordings and additional witness statements will confirm their version of the facts at trial.[3]

After their fight, Roberts and the plaintiffs agree Lowe's employees called the police to report the incident; the plaintiffs left Lowe's at the manager's request; and Roberts contacted Detective Tom Bell, a defendant in this case, about the incident. According to Bell, Roberts was distraught and displayed visible physical injuries. Roberts also told Bell that he wanted Mullannix and Foster to be prosecuted for the incident at Lowe's, and he indicated that he was willing to testify against them if they were arrested and tried for assaulting him.

_____

Once outside, Roberts claimed, Mullannix "swung at me I hit him when I did his friend grab[bed] me by the throt [sic] and Mike hit me in the face and they got me to the ground and Mike started kicking me" until the altercation was broken up by "some Lowes [sic] guy." *Id.*

[3] More specifically, according to the plaintiffs, Roberts approached Mullannix inside the store in a confrontational manner, and Mullannix replied by calling him a "jailhouse snitch." *See, e.g.*, DE 19-1 at 3. This insult enraged Roberts, who then threatened to "kick [Mullannix's] . . . ass" in the parking lot outside the store, left the store, then re-entered the store and threatened to fight Mullannix immediately – inside the store, if necessary. *Id.* at 3-4.

At this point, the plaintiffs claim, Mullannix reluctantly followed Roberts into the parking lot solely "to avoid a confrontation in the actual store confines[,]" while Foster "followed the two outside to prevent or break up the fight if at all possible." *Id.* at 4. Once the two were outside, the plaintiffs claim, Roberts struck the first blows and remained "the aggressor throughout the incident[,]" *see id.*, although Mullannix admits that he took his "hand over top of his [Roberts's] head . . . [and] threw about two or three uppercuts on him" before "James [Foster] broke us up and told me to get back and I got back[,]" *see* DE 26 at 16. Finally, the plaintiffs claim that Roberts was ultimately restrained and "taken to the ground by several Lowe's employees" rather than by Foster or Mullannix. (DE 19-1 at 4.)

4

While Bell met with Roberts, Officer Michael Morris, another defendant in this matter, stopped Mullannix and Foster because he recognized their vehicle from a police dispatch about the incident at Lowe's. Morris discussed the Lowe's incident with the plaintiffs on the side of the road, recorded their names and dates of birth, and then let them go. About an hour later, Morris met Roberts and Bell and discussed the incident with the two of them. At that point, Bell transferred the matter to Morris because Bell, as the lead investigator on the murder case for which Roberts had provided testimony, believed that he faced a potential conflict of interest if he continued to investigate the Lowe's incident. *See* DE 27 at 2-4.

Morris then spoke further with Roberts while Bell prepared criminal complaints and warrants for the plaintiffs, which Morris ultimately signed.[4] *See, e.g.*, DE 27 at 5-6. The warrants were then signed by an assistant county attorney for Scott County and presented to a state court judge, who signed both warrants after finding probable cause to arrest the plaintiffs on a felony count of retaliating against a witness and a misdemeanor count of assault in the fourth degree. *See* DE 23-11, DE 23-12. The plaintiffs were then arrested, and their arrests were

---

[4] By the defendants' own admission, "the Affidavit in support of the warrant for Plaintiff Mullan[n]ix is taken nearly directly from Roberts' statement." (DE 23-2 at 8-9.) Moreover, the defendants concede that "[a]fter preparing the Affidavit for Mullan[n]ix, Det. Bell prepared an identical one for Plaintiff Foster." *Id.* at 9. The defendants also concede that the identical affidavit prepared for Foster's warrant contained certain "extraneous" information discussed in greater detail below. *Id.* Finally, Morris has admitted in deposition testimony that he made no additional efforts to investigate or verify the information provided by Roberts. *See* DE 27 at 7.

5

featured in several media outlets, including at least one story in the *Georgetown News-Graphic* and at least one televised evening news program in Georgetown, both of which connected the plaintiffs and their arrest with the Snellen murder.[5] On December 14, 2004, after a pretrial hearing, the felony charges of retaliating against a witness against both plaintiffs were dismissed for lack of probable cause, *see* DE 23-13 at 5,[6] and the assault charges against both plaintiffs were also subsequently dismissed without trial.

The plaintiffs then filed this suit against Bell, Morris, other unknown officers within the Georgetown Police Department, the Georgetown Police Department itself, and the City of Georgetown. *See* DE 1-3 at 1. In their complaint, the plaintiffs claim that Bell and Morris committed the torts of false arrest and imprisonment; that Bell and Morris defamed the plaintiffs after their arrest by publicly linking them to the Snellen murder; that the defendants were negligent in investigating this matter; and finally, that the defendants are liable under 42 U.S.C. § 1983 because the plaintiffs were arrested and detained without probable cause, thereby violating the plaintiffs' constitutional right to be free from unreasonable

---

[5] A copy of the story from the *Georgetown News-Graphic* is attached to the defendants' motion for summary judgment as part of DE 23-16, and a video copy of the televised news story was filed along with the defendants' motion for summary judgment as DE 23-15.

[6] In her record of this preliminary hearing, the state court judge determined that "[t]he insult and assault were the product of an ongoing problem between Mull[ann]ix and Roberts" because there was "no proof to support the allegation that there is a connection between this fight and any court action." (DE 23-15 at 5.)

searches and seizures when arrested.  *Id.* at 2-7.  For these alleged injuries, the plaintiffs seek compensatory damages, an injunction prohibiting the defendants "from making any future false or reckless statements" about the plaintiffs, an award of punitive damages, costs, and fees.  *Id.* at 7.

## II.   STANDARD OF REVIEW

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citing Fed. R. Civ. P. 56(c)). A principal purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the opposing party.  *Id.*  A judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue exists only when there is sufficient evidence on which the jury could reasonably find for the opposing party.  *Browning*, 283 F.3d at 769 (quoting *Anderson*, 477 U.S. at 252).

The initial burden of showing the absence of a genuine issue of material fact is on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*).  Evidence that is "merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 249 (internal citations omitted).  Furthermore, "the moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only 'show – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (quoting *Celotex*, 477 U.S. at 325).

## III.   ANALYSIS

The plaintiffs' motions for summary judgment (DE 19, DE 21) focus solely on their § 1983 claim;[7] in contrast, the defendants seek summary judgment on the plaintiffs' state law false arrest and imprisonment claims, their negligent investigation claim, their defamation claim, their claim for punitive damages against the City of Georgetown, and their claims against the Georgetown Police Department as an independent entity, as well as their § 1983 claims.  The parties' arguments for and against summary judgment on each of the plaintiffs' claims, as well as the two additional issues raised by the defendants, are discussed in more detail below.

---

[7] Mullannix's short motion for summary judgment (DE 21) essentially adopts the statement of facts and argument presented in Foster's motion (DE 19).

**A.    The Plaintiffs' § 1983 Claim**

**1.    The Warrants**

To successfully establish a claim under 42 U.S.C. § 1983, "a claimant must show that he or she was deprived of a right 'secured by the Constitution and the laws of the United States' by one acting under color of law." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-56 (1978)). The plaintiffs argue that the defendants violated their constitutional rights by arresting and detaining them without probable cause, and "[i]t has long been true that the Fourth Amendment requires probable cause for an arrest." *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). The court's inquiry into the existence of probable cause in this context "turns on whether the 'facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

Furthermore, "[s]ection 1983 claims are limited by the qualified immunity exception, such that a government employee will be shielded from liability so long as the employee acted under the objectively reasonable belief that his or her actions were lawful." *Ahlers*, 188 F.3d at 372-73 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815-19 (1982)). "In addressing qualified-immunity claims," the court must engage in a "two step process": first, the court should "initially . . . consider

9

whether 'the facts alleged show the officer's conduct violated a constitutional right'"; and second, "[i]f the plaintiff can establish that a constitutional violation occurred, a court should ask 'whether the right was clearly established in light of the specific context of the case, not as a broad general proposition.'" *Lyons*, 417 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The defendants claim that the plaintiffs were arrested pursuant to facially valid warrants, and therefore, the defendants argue that they are entitled to summary judgment because "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to § 1983." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). When a plaintiff provides evidence that a defendant knowingly misled or "intentionally omitted information at a probable cause hearing for an arrest or a search warrant[,]" however, then a facially valid warrant is not always sufficient to merit summary judgment, "provided that the misleading or omitted information is critical to the finding of probable cause." *Id.* at 677 n.4. In general, a warrant application "which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997); *see also Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (following *Atkin*, and holding that "allowing omissions to be challenged would create a situation where almost every affidavit of an officer

would be questioned").

For their part, the plaintiffs have suggested that the defendant "officers knowingly and intentionally sacrificed Foster and Mullannix to appease their star witness," *see* DE 40 at 11, by deliberately including false information and deliberately omitting potentially exculpatory information in their warrant applications.  Therefore, the plaintiffs conclude that the defendants "cannot hide behind the warrant[s]" that were issued because they provided "untrustworthy and false information to obtain the warrant[s]."  (DE 19-1 at 16.)  As Detective Bell acknowledged in his deposition, there is no dispute that the warrant application for Foster's arrest included false information: namely, that Foster called Roberts a snitch; that Foster knew a defendant in the Snellen murder; and finally, that Foster physically threatened Roberts.  *See, e.g.*, DE 28 at 19 (acknowledging that the warrant for Foster's arrest was incorrect because Roberts never alleged that Foster called him a snitch and Roberts never alleged that Foster was a friend of a defendant in the Snellen murder).  Under the standard announced in *Voyticky*, *Atkin*, and elsewhere, this is sufficient to overcome the existence of an arrest warrant and defeat the defendants' motion for summary judgment with respect to Foster: the warrant application for Foster's arrest affirmatively included extraneous and false information that was demonstrably false at the time the warrant was made, for which the defendants have not yet provided an adequate explanation.[8]

---

[8]  Although Detective Bell testified in his deposition that he did not know how this false information came to be included in Foster's warrant, *see* DE 28 at

Therefore, the court finds that the defendants are not entitled to summary judgment on Foster's § 1983 claims merely because his arrest was made pursuant to a warrant.

Contrary to the plaintiffs' suggestion, however, the issue is different with respect to Mullannix because there is no evidence, other than the plaintiffs' unsupported allegations, that Mullannix's warrant was based on information that was demonstrably false *at the time the warrant was obtained*. Rather, the errors attributed by the plaintiffs to Mullannix's warrant are all errors of omission: the plaintiffs claim that the warrant for Mullannix's arrest was invalid because the warrant application omitted Roberts's criminal history, including his past conviction for falsely reporting an assault. *See, e.g.*, DE 44-1 at 4-5 (stating that "[i]n this case, Richard Roberts had a conviction for falsely reporting an incident (an assault) . . ., he had been drinking, and he was in a situation (drinking and fighting) that was very common for him," and suggesting that "the combination of these factors" undermined probable cause and invalidated the warrant).

Moreover, unlike the demonstrably false extraneous information *included* in the application for Foster's arrest warrant, this omitted information about Roberts's history was not "critical to the finding of probable cause." *Voyticky*, 412 at 677

---

19, in their motion for summary judgment, the defendants jointly claim that the false information was included due to an innocuous "cut and paste[]" error on a word processor, *see* DE 23-2 at 9. The truth of this claim will have to be proved at trial; at present, it is unsupported by any citation to the deposition testimony of either Bell or Morris.

12

n.4.  Furthermore, the omission of certain evidence is relevant only "in the *very* rare

case where the defendant makes a strong preliminary showing that the affiant *with*

*an intention to mislead* excluded critical information" during a warrant application.

*Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis in original).

While the plaintiffs have repeatedly alleged that the defendants "acted knowingly

and/or with reckless disregard of the truth to violate the rights of Michael

Mullannix, in order to appease an important witness[,]" *see* DE 21-1 at 7, they have

not provided any direct evidence to support this allegation.  Accordingly, because

the plaintiffs have not shown that the omitted information about Roberts's history

was critical, and because the plaintiffs have not shown that the defendants acted

with an intention to mislead by omitting the information about Roberts's history,

the court finds that the existence of the warrant does entitle the defendants to

summary judgment on Mullannix's § 1983 claims.

### 2.    Probable Cause Beyond the Warrants

Beyond the mere existence of the warrant, the defendants also claim that

Roberts's written statement and visible injuries established probable cause for the

plaintiffs' arrests on the assault charges.[9]  An eyewitness's "identification will

--------

[9]  "[W]here no probable cause exists to arrest a plaintiff for a particular
crime, but . . . probable cause exists to arrest that plaintiff for a related offense, the
plaintiff cannot prevail in a suit alleging wrongful arrest brought pursuant to 42
U.S.C. § 1983."  *Voyticky*, 412 F.3d at 676 (citing *Avery v. King*, 110 F.3d 12,
14 (6th Cir. 1997)).  The plaintiffs claim that because the state court found that
probable cause did not exist for the witness retaliation charges, *see* DE 23-15 at 5,
the issue of probable cause for the plaintiffs' arrests is res judicata, *see, e.g.*,
DE 44-1 at 3.  But this argument does not apply to the assault charges in the arrest

constitute sufficient probable cause 'unless, at the time of the arrest, there is an

apparent reason for the officer to believe that the eyewitness was lying, did not

accurately describe what he had seen, or was in some fashion mistaken regarding

his recollection of the confrontation.'" *Ahlers*, 188 F.3d at 370 (quoting *United

States v. Amerson*, No. 93-6360, 1994 WL 589626, at *2 (6th Cir. 1994)).  Thus,

the defendants conclude that they are entitled to summary judgment on the

plaintiffs' § 1983 claims because the existence of probable cause at the time of the

arrests prevents the plaintiffs from showing that they were deprived of their

constitutional rights.  Moreover, because "an officer is under no duty to investigate

further or to look for additional evidence which may exculpate the accused" once

probable cause has been established, *see Ahlers*, 188 F.3d at 371, the defendants

argue that their failure to investigate further after they obtained Roberts's

statement also could not have violated the plaintiffs' constitutional rights.

    For their part, the plaintiffs rely upon *Beck v. Ohio*, 379 U.S. 89, 91 (1964),

which defines probable cause for an arrest as "whether, at the moment the arrest

was made, . . . the facts and circumstances within [the arresting officers']

knowledge and of which they had reasonably trustworthy information were

sufficient to warrant a prudent man in believing that" an offense had been

committed.  Because the defendants relied almost entirely on the uncorroborated

---

warrants for both plaintiffs.  Therefore, under *Voyticky*, the court need not and
does not address this potential res judicata issue because the existence of probable
cause on the plaintiffs' assault charges remains a live issue.

statements and physical condition of Roberts to arrest the plaintiffs, and because "[n]othing about Roberts could have constituted 'reasonably trustworthy information[,]" the plaintiffs conclude that their arrests were not supported by probable cause. *E.g.*, DE 40 at 11.

When the evidence is viewed and all reasonable inferences are drawn in favor of the plaintiffs, the court finds that Foster's arrest may not have been supported by probable cause, and thus, that his constitutional rights may have been violated by his arrest. The defendants have oversimplified the holding of *Ahlers*: while officers need not investigate further once probable cause has been established, *Ahlers* also holds that "in the process of determining whether probable cause exists," officers "cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone[,]" nor may they "make hasty, unsubstantiated arrests with impunity." 188 F.3d at 371, 372.

With respect to Foster's arrest and incarceration, therefore, when the record is viewed in the light most favorable to him, this case more nearly resembles the cases involving "incomplete, poorly conducted investigations" discussed and distinguished in *Ahlers* rather than *Ahlers* itself. *See, e.g.*, *Bevier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) (holding that an officer who lacked easily obtainable evidence regarding an essential element of the crime charged and failed to further investigate did not have probable cause). In this case, the defendants relied almost entirely upon the word of a man whose credibility on this issue was questionable at

15

best.  More importantly, the defendants' justification for Foster's arrest relied almost exclusively on information which was not only "extraneous" but demonstrably false at the time the warrants were being prepared.  Because genuine and material issues remain on the question of probable cause, the court will deny the defendants' motion for summary judgment with respect to Foster.

### 3.    Qualified Immunity

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Therefore, even if Foster's arrest was not supported by probable cause, the defendants argue, they are entitled to summary judgment on the § 1983 claims because they are protected by qualified immunity.  More specifically, they argue that the plaintiffs have not shown and cannot show that their right to be free from arrest was clearly established, as required to overcome their qualified immunity defense, because there is no clearly established caselaw governing the situation at issue in this case.  *See, e.g.*, *Lyons*, 417 F.3d at 571 (quoting *Saucier*, 533 U.S. at 201, and holding that "[i]n addressing qualified immunity claims," courts "should ask "'whether the right was clearly established in light of the specific context of the case'"); *see also Thacker v. City of Columbus*, 328 F.3d 244, 260 (6th Cir. 2003) (quoting *Thomas v. Cohen*, 304 F.3d 563, 580 (6th Cir. 2002), and holding that "'[i]mmunity applies if reasonable officials could disagree as to whether the

16

conduct violated the plaintiff's rights'"). In response, the plaintiffs argue that *they* are entitled to summary judgment on the qualified immunity issue because, even when the facts are viewed in the light most favorable to the defendants, no reasonable officer could disagree that Bell and Morris violated the plaintiffs' clearly established rights.

"'The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Brosseau*, 543 U.S. at 199 (quoting *Saucier*, 533 U.S. at 201-02). Contrary to the defendants' suggestion, identical "precedent is not required for qualified immunity purposes." *Thacker*, 328 F.3d at 259. For all the reasons discussed above, the court finds that the plaintiffs have created a genuine issue of material fact on the defendants' qualified immunity with respect to Foster's arrest. When the evidence is viewed and all inferences from the evidence are drawn in the light most favorable to the plaintiffs, the court finds that the unlawfulness of Foster's arrest may have been apparent to a reasonable officer in the defendants' position, and therefore, the court will deny the defendants' motion for summary judgment on Foster's § 1983 claim. At the same time, when the evidence, including Roberts's statement and physical condition, is viewed in the light most favorable to the defendants, the court finds that a reasonable officer in the defendants' shoes might have believed that Foster's arrest was lawful. Therefore, the court will also deny the plaintiffs' motion for summary judgment on

17

Foster's § 1983 claim.

**B.    The Plaintiffs' State Law False Arrest and False Imprisonment Claims**

"False arrest claims can be brought under either federal or state law[,]" *see, e.g.*, *Voyticky*, 412 F.3d at 677, and the plaintiffs in this case have stated false arrest and false imprisonment claims based on both § 1983 and under state law, *see* DE 1-3 at 4-7, 2.  Under Kentucky law, "'[f]alse arrest' or 'false imprisonment' is any unlawful physical restraint by one of another's liberty, whether in prison or elsewhere." *Great Atl. & Pac. Tea Co. v. Billups*, 69 S.W.2d 5, 6 (Ky. 1934).  To sustain such a claim under Kentucky law, a plaintiff must show that he was detained, and that his detention was unlawful. *Pennington v. Dollar Tree Stores, Inc.*, 104 F. Supp. 2d 710, 713 (E.D. Ky. 2000) (citing *Wal-Mart Stores, Inc. v. Mitchell*, 877 S.W.2d 616, 617 (Ky. Ct. App. 1994)).

Because Kentucky law, like federal law, defines lawful arrests as those arrests made pursuant to a warrant or under probable cause without a warrant, *see* Ky. Rev. Stat. § 431.005(1), (2), the defendants argue that the same defenses that apply to the plaintiffs' § 1983 claims should also apply to the plaintiffs' state law false arrest and false imprisonment claims.  The plaintiffs have not directly responded to this argument; instead, they briefly refer again to the state court proceedings in the original criminal action against the plaintiffs, in which the state court judge allegedly said: "'I don't see anything, whatsoever, to have – have based this charge against Mr. Foster.'" (DE 40 at 18.)  Therefore, the court finds

18

that its reasoning and conclusions about the plaintiffs' § 1983 claims apply to the plaintiffs' state law false arrest and false imprisonment claims.  Accordingly, the court will grant the defendants' motion for summary judgment with respect to Mullannix's state law false arrest and false imprisonment claims, while denying both the defendants' and the plaintiffs' motions for summary judgment with respect to Foster's state law false arrest and false imprisonment claims.

## C.    The Plaintiffs' Negligence Claims

Under Kentucky law, qualified immunity "'applies to the negligent performance by a public officer or employee'" of all acts "involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment[,]" which are taken "in good faith . . . within the scope of the employee's authority.'" *Jones v. Lathram*, 150 S.W.3d 50, 53 (Ky. 2004) (quoting *Yanero v. Davis*, 65 S.W. 3d 510, 522 (Ky. 2001)).  According to the plaintiffs' complaint, the defendants "were negligent in the discharge of their official duties as they failed to conduct a reasonably skilled investigation" before they arrested, imprisoned, and charged the plaintiffs.  (DE 1-3 at 3.)  The defendants contend that this state-law negligence claim is barred by qualified immunity because the defendants' investigation, or lack thereof, was a discretionary judgment taken in good faith within the scope of their authority.

The plaintiffs have offered no direct response to this argument.  Instead, the plaintiffs have responded only to the defendants' argument that the defendants did

19

not owe a relevant duty to the plaintiffs, *see* DE 40 at 18-19, an issue the court need not and does not address because the court finds that the plaintiffs' negligence claim is barred by qualified immunity.  The defendants' failure to investigate further, standing alone, was a discretionary judgment taken within the scope of their authority; moreover, as discussed above, the plaintiffs have offered no proof – only unsupported allegations – that this judgment was taken in bad faith.

**D.    The Plaintiffs' Defamation Claims**

Under Kentucky law, "words are regarded as actionable per se only when they charge or impute" activities falling into one of four categories: first, "the commission of a crime involving moral turpitude"; second, "affliction with an infectious disease likely to exclude the accused from society"; third, "unfitness to perform the duties of an office, occupation, or employment, or having a tendency to prejudice a person in his trade, calling, or profession"; and fourth, "acts which might tend to disinherit the person charged." *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953).  According to the complaint, after the plaintiffs' arrests, Bell and Morris "each spoke to media outlets, alleging that the Plaintiffs were criminally linked to the then pending Diane Snellen murder case in Scott Circuit Court."  (DE 1-3 at 2-3.)  In addition, the plaintiffs' complaint claims that both Bell and Morris "each further alleged that the Plaintiffs had visited one or more Snellen murder Defendants in the Scott County Detention Center."  *Id.* at 3.  Finally, the plaintiffs

20

claim that Bell and Morris "each stated or implied to media outlets that the Plaintiffs acted in concert" with the defendants in the Snellen murder "to somehow assist the incarcerated murder Defendants in their cause." *Id.* The plaintiffs argue that these alleged statements clearly meet the definition of "defamation per se as retaliating against a witness and participation in a murder clearly involve moral turpitude." (DE 40 at 20.)

In their motion for summary judgment, the defendants argue that they are entitled to summary judgment on the defamation claim because they did not make any statements "'linking' the Plaintiffs to the murder case or referring to Plaintiffs' assistance to the defense of the murder case." (DE 23-2 at 37.) But according to a story published in the *Georgetown News-Graphic* on October 22, 2004, Bell told reporters that the plaintiffs "may have gotten the witness' [Roberts's] name from Crabtree [a defendant in the Snellen murder] while visiting him in jail," *see* DE 23-16 at 1, and Bell did not deny making such a statement to reporters during his deposition, *see* DE 28 at 14. Contrary to the defendants' claim, therefore, the court finds that at least one of the defendants may have made at least one statement to members of the media linking the plaintiffs to the Snellen murder, which is sufficient to defeat the defendants' motion for summary judgment.

In the alternative, the defendants argue that this statement and other statements allegedly made to media outlets about the plaintiffs were not defamatory because they fell within a well-established conditional immunity for

statements made by the police to members of the press or public.  To support this argument, the defendants rely upon *Lanier v. Higgins*, 623 S.W.2d 914 (Ky. Ct. App. 1981),[10] but *Lanier* actually undercuts their argument.  In *Lanier*, the Court of Appeals of Kentucky reversed a trial court's decision to grant immunity to the statements of a police chief made during a television interview.  While recognizing that the public interest in allowing the police "to exercise their duties unembarrassed by the fear of damage suits arising from acts done in the course of those duties[,]" the Kentucky Court of Appeals further recognized that "the public also has interests that officials act responsibly, that they furnish it with accurate information, and that the good reputations of citizens not be damaged wrongfully."  623 S.W.2d at 916.  Because the court finds that the defendants have not shown that all of the allegedly defamatory statements were protected, the court will deny the defendants' motion for summary judgment on the defamation claims raised by both plaintiffs.

**E.    Two Additional Issues**

In their complaint, the plaintiffs seek punitive damages, but the defendants

---

[10]    Elsewhere, the defendants suggest that the allegedly defamatory statements are protected because they were made during the exercise of official police duties.  *See* DE 23-2 at 40-41 (citing, inter alia, *Burke v. Town of Walpole*, 405 F.3d 66 (1st Cir. 2005), and *Trentecosta v. Beck*, 703 So.2d 552 (La. 1997)).

With respect to any allegedly defamatory statements the defendants may have made during the warrant application process, this argument may be correct; however, the court need not and does not address this question because the evidence that the defendants made allegedly defamatory statements to various media outlets (such as the *Georgetown News-Graphic*) *beyond* the scope of their official duties is sufficient to defeat their motion for summary judgment.

claim that the plaintiffs are not entitled to punitive damages against the City of Georgetown under either § 1983 or Kentucky law, and the plaintiffs have not responded to this claim.  A municipality, such as the City of Georgetown, "is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  Similarly, under Kentucky law, "[t]he amount of damages recoverable against a local government for death, personal injury or property damages . . . shall not exceed the total damages" suffered by a plaintiff.  Ky. Rev. Stat. § 65.2002.  Therefore, the court finds that the defendants are entitled to summary judgment on the plaintiffs' claim for punitive damages against the city of Georgetown.

Finally, the defendants claim that the Georgetown Police Department, which is named as an independent defendant in the plaintiffs' complaint, is entitled to summary judgment because it is not a suable party.  The plaintiffs have not responded to this claim.  As in *Higgenbottom v. McManus*, 840 F. Supp. 454, 456 (W.D. Ky. 1994), the defendants suggest that the Georgetown Police Department is a mere division of the city's government, without a separate legal existence of its own, and thus not subject to independent liability.  Accordingly, the court finds that "the Police Department is not an entity which may be sued," *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); therefore, the court will dismiss that portion of the plaintiffs complaint that seeks to recover damages from the Georgetown Police Department.  Accordingly,

**IT IS ORDERED** that the plaintiffs' motions for summary judgment (DE 19, DE 21) are **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (DE 23) is **DENIED IN PART** and **GRANTED IN PART**.

Signed on May 7, 2007

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY